IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 12-cv-03141-PAB

DENISE M. ESCARENO,

      Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

      Defendant.

---

**ORDER**

---

This matter is before the Court on plaintiff Denise M. Escareno's opening brief
[Docket No. 14], filed on June 6, 2013.  Plaintiff seeks review of the final decision of
defendant Carolyn W. Colvin (the "Commissioner") denying plaintiff's claim for disability
insurance benefits and supplemental security income under Titles II and XVI of the
Social Security Act (the "Act"), 42 U.S.C. §§ 401-33 and 1381-83c.[1]  The Court has
jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 405(g).

**I.  BACKGROUND**

On November 18, 2009, plaintiff applied for disability benefits under Title II of the
Act and, on May 1, 2010, she applied for benefits under Title XVI of the Act.  R. at 27.
Plaintiff alleged that she had been disabled since November 10, 2009.  *Id.*  After an
initial administrative denial of her claim, plaintiff appeared at a hearing before an

---

[1] The Court has determined that it can resolve the issues presented in this matter
without the need for oral argument.

Administrative Law Judge ("ALJ") on June 15, 2011.  *Id*.  On August 4, 2011, the ALJ

issued a decision denying plaintiff's claim.  *Id*. at 37.

The ALJ found that plaintiff had the severe impairments of fibromyalgia and

depression.  R. at 29.  The ALJ found that these impairments, alone or in combination,

did not meet one of the regulations' listed impairments, *id*. at 30, and ruled that plaintiff

had the residual functional capacity ("RFC") to:

> perform light work as defined in 20 C.F.R. §§ 494.1567(b) and 416.967(b),
> while sitting and standing/walking for up to six hours each in a regular eight
> hour work day; lifting and carrying up to ten pounds frequently, and up to
> twenty pounds occasionally; pushing and pulling with her upper and lower
> extremities within the aforementioned weight restrictions; no more than
> frequently engaging in handling activities with her bilateral upper extremities;
> avoiding extremes of cold; only occasionally climbing, stooping, crouching,
> kneeling, or crawling; and while performing [] unskilled work, with a specific
> vocational preparation (SVP) rating level of one or two.

*Id*. at 30-31.  Based upon this RFC and the testimony of a vocational expert ("VE"), the

ALJ concluded that "the claimant is capable of making a successful adjustment to other

work that exists in significant numbers in the national economy."  R. at 36.

The Appeals Council denied plaintiff's request for review of this denial.  R. at 1.

Consequently, the ALJ's decision is the final decision of the Commissioner.

## II.  ANALYSIS

### A.  Standard of Review

Review of the Commissioner's finding that a claimant is not disabled is limited to

determining whether the Commissioner applied the correct legal standards and whether

the decision is supported by substantial evidence in the record as a whole.  *See Angel*

*v. Barnhart*, 329 F.3d 1208, 1209 (10th Cir. 2003).  The district court may not reverse

an ALJ simply because the court may have reached a different result based on the

record; the question instead is whether there is substantial evidence showing that the

ALJ was justified in her decision.  *See Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir.

1990).  "Substantial evidence is more than a mere scintilla and is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."

*Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).  Moreover, "[e]vidence is not

substantial if it is overwhelmed by other evidence in the record or constitutes mere

conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  The district

court will not "reweigh the evidence or retry the case," but must "meticulously examine

the record as a whole, including anything that may undercut or detract from the ALJ's

findings in order to determine if the substantiality test has been met."  *Flaherty*, 515

F.3d at 1070*.*  Nevertheless, "if the ALJ failed to apply the correct legal test, there is a

ground for reversal apart from a lack of substantial evidence."  *Thompson v. Sullivan*,

987 F.2d 1482, 1487 (10th Cir. 1993).

### B.  The Five-Step Evaluation Process

To qualify for disability benefits, a claimant must have a medically determinable

physical or mental impairment expected to result in death or last for a continuous period

of twelve months that prevents the claimant from performing any substantial gainful

work that exists in the national economy.  42 U.S.C. § 423(d)(1)-(2).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical
> or mental impairment or impairments are of such severity that he is not only
> unable to do his previous work but cannot, considering his age, education,
> and work experience, engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of whether such work exists
> in the immediate area in which he lives, or whether a specific job vacancy

exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A) (2006).  The Commissioner has established a five-step

sequential evaluation process to determine whether a claimant is disabled.  20 C.F.R.

§ 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).  The steps of the

evaluation are:

> (1) whether the claimant is currently working; (2) whether the claimant has
> a severe impairment; (3) whether the claimant's impairment meets an
> impairment listed in appendix 1 of the relevant regulation; (4) whether the
> impairment precludes the claimant from doing his past relevant work; and (5)
> whether the impairment precludes the claimant from doing any work.

*Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (citing 20 C.F.R.

§ 404.1520(b)-(f)).  A finding that the claimant is disabled or not disabled at any point in

the five-step review is conclusive and terminates the analysis.  *Casias v. Sec'y of*

*Health and Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

The claimant has the initial burden of establishing a case of disability.  However,

"[i]f the claimant is not considered disabled at step three, but has satisfied her burden of

establishing a prima facie case of disability under steps one, two, and four, the burden

shifts to the Commissioner to show the claimant has the residual functional capacity

(RFC) to perform other work in the national economy in view of her age, education, and

work experience."  *See Fischer-Ross v. Barnhart,* 431 F.3d 729, 731 (10th Cir. 2005);

*see also Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5 (1987).  While the claimant has the

initial burden of proving a disability, "the ALJ has a basic duty of inquiry, to inform

himself about facts relevant to his decision and to learn the claimant's own version of

those facts." *Hill v. Sullivan,* 924 F.2d 972, 974 (10th Cir. 1991).

### C.  The ALJ's Decision

Plaintiff argues that the ALJ erred in (1) placing undue emphasis on the absence of objective medical evidence that plaintiff's pain is disabling; (2) unreasonably discounting plaintiff's subjective complaints of pain; and (3) giving little or no weight to the opinions of plaintiff's treating physician Gregory Berens.  Docket No. 14.

The relevant facts are as follows.  Dr. Berens began treating plaintiff in December 2005.  R. at 357.  In May 2008, plaintiff had a neurology consultation with Dr. Ashakiran Sunku, who found that "[electromyogram ("EMG")]/nerve conduction studies[2] of the bilateral upper extremities . . . are within the limits of normal."  R. at 261.  He also found that magnetic resonance imaging ("MRI") of plaintiff's cervical spine showed "minimal changes of degenerative disk disease."  *Id*.  In September 2009, plaintiff complained of a severe headache accompanied by visual disturbances and facial numbness.  R. at 275.  A computed tomography ("CT") scan[3] of her head revealed "no acute intracranial findings."  *Id*.

In December 2009, Dr. Berens found that an x-ray of plaintiff's hand revealed "no bone, joint or soft tissue abnormality."  R. at 297.  The same month, plaintiff had a pain management consultation with Dr. Divakara Kedlaya, a pain specialist, to whom plaintiff complained of "pain all over the body."  *Id*. at 277.

---

[2]An electromyogram is a "graphic representation of the electric currents associated with muscular action."  Stedman's Medical Dictionary 126730 (27th ed. 2000).

[3]Computed tomography involves "imaging anatomic information from a cross-sectional plane of the body, each image generated by a computer synthesis of x-ray transmission data obtained in many different directions in a given plane."  Stedman's Medical Dictionary 411890 (27th ed. 2000).

In January 2010, Dr. Sunku repeated the nerve conduction study and found that the results were normal.  R. at 319.

Also in January 2010, plaintiff met with Dr. Kedlaya for complaints of chronic "all over pain," as well as back pain, joint pain, join swelling, headache, and numbness.  *Id*. at 299, 301.  Plaintiff told Dr. Kedlaya that the acetaminophen and oxycodone she had been prescribed were "helping with [the] pain" and that she was "[s]leeping better," but was still "having pain in both hands, pain down left lower limb."  *Id*. at 300.  Dr. Kedlaya found that plaintiff had "tenderness in [lumbosacral] region, bilateral wrist, hand tenderness" and neurological symptoms of "tremor, left lower limb numbness."  *Id*. at 301.  On February 2, 2010, Dr. Kedlaya found that plaintiff had "bilateral hands tenderness, swelling, Cervical and [lumbosacral] [] tenderness."  R. at 346.  On March 2, 2010, Dr. Kedlaya found that plaintiff had "[m]ultiple tender points throughout spine and extremities, Bilateral hands/digits joint swollen, tender."  *Id*. at 342.  On March 30, 2010, Dr. Kedlaya found that plaintiff had "[m]ultiple areas of tenderness in C-spine, shoulder, both hands, legs, joints, [lumbosacral] region."  *Id*. at 339.  In April 2010, plaintiff told Dr. Kedlaya that "her pain [was in] fair control with meds."  R. at 335.  Dr. Kedlaya found plaintiff had "multiple tender regions, tenderness in both hands, knees."  *Id*.  In April 2010, plaintiff told Dr. Berens that her pain was "not worsening, but [was] not much better" and that she was not sleeping well.  R. at 349.  In May 2010, plaintiff told Dr. Kedlaya that "her pain [was] doing better."  *Id*. at 332.  In July 2010, plaintiff told Dr. Kedlaya that she was not smoking.  R. at 377.

On July 19, 2010, Dr. Berens completed a Fibromyalgia Medical Source

Statement for plaintiff in which he opined that she had the following symptoms: multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, vestibular dysfunction, temporomandibular joint dysfunction, numbness and tingling, and depression.  R. at 357.  He opined that "occasional [] depressive symptoms increase her pain."  *Id*.  He opined that she had pain in her lumbosacral spine, cervical spine, thoracic spine, chest, left shoulder, arms, hands, fingers, hips, legs, knees, ankles, and feet; that she experienced burning, deep aching pain, tingling, numbness, and "electrical shock type pains"; that her pain was precipitated by changing weather, fatigue, movement, overuse, cold, stress, and remaining in one position; that a side effect of her medication was occasional mild grogginess; that she could walk half a city block without stopping, sit for twenty minutes at a time, stand for twenty minutes at a time, and sit or stand/walk for a total of four hours each in an eight-hour day; that she would have to stand up to walk for five minutes in every thirty minutes of sitting; that she would have to take unscheduled breaks every two to three hours for five to ten minutes during which she would need to lie down or sit quietly; that she could lift up to ten pounds, rarely; rarely twist. climb stairs, and stoop, but never crouch, squat, or climb ladders; occasionally turn her head or hold her head in a static position; grasp, turn, twist, finely manipulate objects, or reach in front of her body for twenty percent of an eight-hour workday; and reach overhead for ten percent of an eight-hour workday.  *Id*. at 357-60.  He opined that she would be "off task" for twenty-five percent or more of an eight-hour workday and would need to miss work four days per month, but was capable of tolerating low stress.  *Id*.

On September 9, 2010, Dr. Berens opined that plaintiff was "currently totally & permanently disabled."  R. at 362.

On March 10, 2011, Dr. Berens completed a Revised Medical Assessment of Ability to Do Work-Related Activities (Physical) for plaintiff, in which he opined that plaintiff could lift or carry up to twenty pounds on an occasional basis; could reach, handle, finger, feel, push, or pull with both hands for one-third to two-thirds of an eight-hour workday; and could occasionally climb stairs and ramps, but never stoop.  R. at 364-68.  Dr. Berens' March 2011 opinion does not otherwise meaningfully differ from his July 2010 opinion, although the two forms phrase similar questions in a different manner.  *Compare* R. at 357-60 *with* R. at 364-68.

At the hearing before the ALJ, plaintiff testified that her sixteen-year-old daughter receives Social Security disability benefits because she had a tracheoesophageal fistula repair performed when she was born.  R. at 50-51.  With respect to this daughter, plaintiff testified that "physically she can, you know, she's capable of doing–like she does dishes, and her homework and stuff like that.  Her problems are [] internal. . . . And it's just the medications [] that she goes through that cause her to get sick some days."  *Id*. at 54.  Plaintiff testified that when her son brings over her sixteen-month-old granddaughter, plaintiff tries to hold her, but "can't hold her very long because [her] arm just gives out" and so her son will "sit down on the floor with the girls, and they'll like fix a puzzle, and, and I'll just kind of watch them, and laugh, and, you know, talk to them."  *Id*. at 51.  She testified that she watches some television, no longer reads very much, and drives "sometimes . . . just around the corner."  *Id*. at 53.  She testified that she smokes "every once in a while, but not very much anymore because [she] can't really

stand for long." *Id*. at 55.  She testified that she cannot do laundry, but she can take

quick trips to buy groceries as long as she does not have to carry too much, can do "a

few dishes," and can talk her older daughter through the process of cooking meals.  *Id*.

at 60.  The ALJ asked the VE whether there were jobs available for an individual with

plaintiff's RFC who was "unable to sustain concentration, persistence, and pace

necessary to consistently fulfill work for eight hours a day, five days a week" and the VE

stated that there were not.  *Id*. at 70.

> The ALJ began her analysis of plaintiff's credibility as follows:

> [T]reating and examining sources have not documented the level of corresponding physical dysfunction that one would expect, given her allegation of such constant and severe pain to the extent that it prevents her from sustaining any level of work activity.  For example, EMG/nerve conduction study results of her upper extremities from May 2008 returned normal findings, as did an EMG study of her right upper extremity in 2010. Results of an MRI of her cervical spine in 2008 indicated only minimal degenerative changes, a CT scan of her head in 2009 indicated no acute findings to explain her headache complaints, results of a 2009 x-ray of her hands indicated no abnormalities, and a 2010 MRI of her lumbar spine returned no evidence of disc herniation, spinal stenosis, or nerve root impingement.  Results of a later MRI of her right hand done in 2010 were interpreted as unremarkable, with no evidence to support a diagnosis of rheumatoid arthritis.

> Exam findings are also less than supportive of a finding of significant physical dysfunction, commensurate with her complaints of pain.  The physician who has provided pain management for the claimant, Divakara Kedlaya, MD, noted during an early exam in January 2010 that the claimant exhibited tenderness to palpation of the lumbar spine, tenderness in the bilateral hands and wrists, a tremor, and lower left extremity numbness . . . . During subsequent exams over the next two months, the claimant was again noted to exhibit swelling and tenderness in her hands, and tenderness in her spine, although neurological and psychological exam findings were again deemed normal.  During this same time frame, the claimant was being treated by a rheumatologist, Patrick Timms, MD, for a possible diagnosis of rheumatoid arthritis.  However, in March and April 2010 this source noted that the claimant's rheumatoid factor results were only slightly elevated, she exhibited only minimal swelling in her wrists and hands, she exhibited no

signs of synovitis, and MRI results of her hand indicated no evidence of rheumatoid arthritis.  He concluded that she was primarily experiencing symptoms of fibromyalgia, with no evidence of rheumatoid disease. . . .

R. at 32.

The ALJ concluded that plaintiff's subjective complaints of pain were not entirely credible based on the "medical evidence indicating improvement in her pain, lack of evidence of significant physical dysfunction, her non-compliance with recommended treatment, and the other inconsistencies detailed" in the ALJ's decision.  R. at 34.  The ALJ cited the following as evidence of inconsistency between plaintiff's subjective complaints of pain and the other record evidence: (1) medical sources documented plaintiff's complaints of pain, but not resulting functional limitations; (2) the examination findings were "less than supportive of a finding of significant physical dysfunction"; (3) plaintiff told Dr. Kedlaya in April 2010 that her pain was "under fair control" and that she was sleeping better, but told Dr. Berens that her pain was not much better and she was not sleeping well; (4) plaintiff told Dr. Kedlaya in July 2010 that she had stopped smoking, but testified at the hearing that she still smokes "every once in a while"; (5) plaintiff testified to performing daily activities in excess of her alleged activities at the time she filed her claim, indicating a "significant improvement in her functional abilities"; and (6) plaintiff is not regularly exercising or abstaining from cigarettes, despite Dr. Kedlaya's recommendation that she do so.  R. at 32-34.

With respect to Dr. Berens' opinions, the ALJ gave no weight to Dr. Berens' July 2010 opinion, based on the ALJ's finding that the opinion:

> is not supported by [Dr. Berens'] own treatment notes to that time, which reflect documentation primarily of the claimant's pain complaints, but not of any observed or tested physical dysfunction or specific physical limitation

resulting from this alleged pain.  Furthermore, the claimant began reporting improvement in her pain levels to Dr. Kedlaya beginning in June 2010, and his treatment notes also fail to document the level of associated physical dysfunction one would expect given the claimant's reports of her pain.

R. at 35.  The ALJ gave "little weight" to "much of" Dr. Berens' March 2011 opinion,

based on the ALJ's finding that:

the evidence of record simply does not support that the claimant is so limited, especially in her ability to engage in postural activities, as records from treating sources, as previously discussed, do not reflect a level of physical dysfunction which would reasonably result in such extensive limitations. Sources have typically noted only tenderness to palpation, with little or no mention of limitation in motion, difficulty with ambulation, or other restricting physical dysfunction.

R. at 35.

Plaintiff argues that the ALJ erroneously discounted plaintiff's complaints of pain

on the basis that "treating and examining sources have not documented the level of

corresponding physical dysfunction that one would expect."  Docket No. 14 at 5 (citing

R. at 32).

"Credibility determinations are peculiarly the province of the finder of fact" and

the Tenth Circuit will uphold such determinations, so long as they are supported by

substantial evidence.  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir.1995).  Credibility

determinations may not be conclusory, but must be "closely and affirmatively linked" to

evidence in the record.  *Id.*  In assessing a claimant's credibility, an ALJ must consider

the following factors, in addition to the objective medical evidence:

1.  The individual's daily activities;

2.  The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.  Factors that precipitate and aggravate the symptoms;

11

4.  The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.  Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996); *see also* 20 C.F.R. § 404.1529(c)(4)

("We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence . . . ."). "Because a credibility assessment requires consideration of all the factors 'in combination,' when several of the factors *relied upon* by the ALJ are found to be unsupported or contradicted by the record, we are precluded from weighing the remaining factors to determine whether they, in themselves, are sufficient to support" the credibility determination. *Bakalarski v. Apfel*, 1997 WL 748653, at *3 (10th Cir. Dec. 3, 1997) (quoting *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988)). In addition, the Court may not "create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision itself." *Grogan v. Barnhart*, 399 F.3d 1257, 1263 (10th Cir. 2005).

Fibromyalgia is a "syndrome of chronic pain of musculoskeletal origin but uncertain cause." Stedman's Medical Dictionary 148730 (27th ed. 2000). Fibromyalgia can be the basis for a finding of disability. SSR 12-2P, 2012 WL 3104869, at *1 (July 25, 2012). However, because it is "poorly-understood within much of the medical

community" and "diagnosed entirely on the basis of patients' reports and other symptoms," *Brown v. Barnhart*, 182 F. App'x 771, 773 n.1 (10th Cir. 2006) (citation omitted), it "presents a conundrum for insurers and courts evaluating disability claims". *Welch v. Unum Life Ins. Co. of Am.*, 382 F.3d 1078, 1087 (10th Cir. 2004) (citation omitted) (citation omitted); *see also Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) ("Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective.  There are no laboratory tests for the presence or severity of fibromyalgia.  The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and–the only symptom that discriminates between it and other diseases of a rheumatic character–multiple tender spots").

The American College of Rheumatology has set forth the following Criteria for the Classification of Fibromyalgia: a history of pain in all quadrants of the body that persists for at least three months and at least eleven out of eighteen positive tender points on physical examination.  SSR 12-2P, 2012 WL 3104869, at *2-3 (July 25, 2012).  Diagnosis includes ruling out "other disorders that could cause the symptoms or signs" through imaging and other laboratory tests.  *Id*. at *3.  While the "disease itself can be diagnosed more or less objectively," the "amount of pain and fatigue that a particular case of it produces cannot be."  *Hawkins v. First Union Corporation Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003).  Accordingly, the "lack of objective test findings . . . is not determinative of the severity of [a claimant's] fibromyalgia."  *Gilbert v. Astrue*, 231 F. App'x 778, 784 (10th Cir. 2007); *see also Richardson v. Astrue*, 858 F. Supp. 2d 1162, 1175 (D. Colo. 2012) (finding that the ALJ

"erred by discounting all of Plaintiff's symptoms from fibromyalgia based on the lack of objective tests").

Plaintiff argues that "the ALJ placed the greatest weight by far on whether testing and examination sufficiently proved, to the ALJ's satisfaction, Plaintiff's complaints of debilitating pain." Docket No. 14 at 4. Although the ALJ's decision does not disclose the respective weight accorded to the different factors she considered in finding plaintiff's complaints of pain not fully credible, it is clear that the absence of examination findings supporting the severity of plaintiff's complaints–as well as the normal results of plaintiff's MRIs, nerve conduction studies, CT scan, and x-ray–contributed to the ALJ's conclusion. *See* R. at 32. However, there are no laboratory tests that can assess the severity of fibromyalgia, *see Sarchet*, 78 F.3d at 306; *see also Hawkins*, 326 F.3d at 919; *Gilbert*, 231 F. App'x at 784, and the ALJ cites nothing to the contrary. Thus, the cited examination findings are not relevant to the severity of plaintiff's fibromyalgia. See *Gilbert*, 231 F. App'x at 784; *see also Sarchet*, 78 F.3d at 307 ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced.").

Moreover, in order to diagnose fibromyalgia, physicians have to rule out other potential causes of a patient's pain, such as rheumatologic disorders, Lyme disease, and cervical hyperextension- or hyperflexion-associated disorders. SSR 12-2P, 2012 WL 3104869, at *3 n.7. Plaintiff's physicians did not opine that the negative test results cited by the ALJ, including the conclusion that plaintiff does not suffer from rheumatoid arthritis, undermine plaintiff's complaints of disabling pain. *See, e.g.,* R. at 261-62 and

320 (noting "possible fibromyalgia" diagnosis and "question of fibromyalgia" in light of otherwise normal test results); and R. at 324 (noting normal x-ray result and stating that plaintiff "has been on essentially every medication we use for fibromyalgia" and physician will leave further treatment up to plaintiff's pain management doctor).  In addition, after stating that "[e]xam findings [were] also less than supportive of a finding of significant physical dysfunction," the ALJ reviewed evidence that Dr. Kedlaya found that plaintiff exhibited a number of tender points over the course of several months.  R. at 32.  The ALJ's implication that these findings–which are consistent with a diagnosis of fibromyalgia–detract from plaintiff's credibility is incorrect.  *See id*.

Although the ALJ considered other factors in addition to the lack of objective examination findings regarding the severity of plaintiff's pain, the Court cannot "weigh[] the remaining factors to determine whether they, in themselves, are sufficient to support" the ALJ's credibility determination.  *Bakalarski*, 1997 WL 748653, at *3.  Thus, this matter must be remanded so that the ALJ can assess plaintiff's credibility without considering non-relevant information.  *See Beauclair v. Barnhart*, 453 F. Supp. 2d 1259, 1279-80 (D. Kan. 2006) (remanding case where ALJ's credibility determination was based, in part, on ALJ's mistaken finding that plaintiff demonstrated only four tender points when in fact plaintiff's physician had found eight tender points).

The Court will not address plaintiff's argument regarding the weight accorded to Dr. Berens' opinions because the ALJ's analysis on remand may impact how these opinions are weighed.  *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the ALJ's treatment of this case on remand.").  The Court notes that plaintiff

has not challenged the ALJ's determination with respect to the impairment of

depression.  *See* Docket No. 14 at 3-13.

## III.  CONCLUSION

It is

**ORDERED** that the decision of the Commissioner that plaintiff was not disabled

is REVERSED and REMANDED for further proceedings consistent with this opinion.


DATED April 28, 2014.

BY THE COURT:


  s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge